Case number 25-3693, Mark Charlton Perkins v. University of Cincinnati, et al. Oral argument, 15 minutes per side. Mr. Mezeboff for the appellate. You may proceed. Good morning, your honors. May it please the court, Mark Mezeboff on behalf of Professor Charlton Perkins. Your honors, Professor Perkins is asking this court to reverse the district court's decision and allow this case to go to trial on the merits as to whether he was subjected to discrimination on account of his gender. As we know, the defense has raised a number of legal issues, but the overriding issue, the controlling issue is, I believe, the issue of motivation and the question of whether Professor Charlton Perkins has submitted sufficient facts to survive summary judgment. There are two issues here, but they're bound, whether or not the rejection of the recommendation of the search committee, alone or in combination with the decision to cancel the search in its entirety, constituted an adverse action, which was motivated in whole or part by the fact that Professor Charlton Perkins is a male. Can I stop you and just ask a preliminary question? So the Supreme Court just granted cert on the question whether Title IX even applies to employment actions whatsoever. So I'm curious of your thoughts of what we should do with that, because I think if they were to rule that Title IX doesn't apply to employment actions, then it would essentially eliminate at least that part of your case. So I'm just curious what the effect of the cert grant should be here. Should we stay the case? Should we keep going forward and assume that it will be applied in your favor? Frank, I'm not sufficiently familiar with that grant of cert to substantively address the issue. I would note, however, that in addition to the Title IX, there is a constitutional claim here for equal protection. So I think overall on the merits, there are still grounds to go forward with the appeal. What we have here is a decision by the district court on the equal protection argument that there's not a sufficient evidentiary basis to survive summary judgment. Counsel, I'm not as concerned about whether or not there's enough evidence to go to a jury on the liability. My question is, is it the circumstances that led to the end of this transaction, which was that the university decided not to hire anyone at all, as opposed to hiring someone else of a different gender? Doesn't that make this case kind of an unusual one where we really don't have any clear authority saying that this would violate the equal protection clause? Dealt with that issue and the court dealt with this issue in the earlier litigation in connection with the issue of ripeness. And I think the court was clear that in this instance, Professor Charles Perkins was talking about an issue that was complete in the sense that he was denied an opportunity to work as a professor. So that issue was complete. It was ripe. Um, and the court, I thought was pretty clear that very clear that whether or not he was replaced, so to speak, or that someone else was hired, did not drive or determine whether or not there was a viable case here. And I think, I think that answers the court's question. The fact is that he was rejected, uh, and whether or not they've hired somebody or canceled the search, uh, it was a fait accompli. He was, he was denied a position. We believe because of his gender, we believe the, uh, the, uh, the evidence, uh, amply supports that, uh, that argument. So we're talking about equal protection. Um, you, uh, you had indicated that you thought our earlier opinion was sufficient to address the question of whether it was clearly established that this was an equal protection violation. I believe in your briefing, your argument, it's obvious. Uh, what is the basis of you're saying that it's an obvious equal protection violation for purposes of, of initiating qualified immunity? Statements, uh, throughout the, uh, the record, uh, such as, uh, discussion statements as early as October before the search even began, that there was an underemployment of female faculty and communications went on from, uh, Petrin and from, uh, uh, Dr. Utz, that the department was bereft of female candidates, comments that the department was short on women. It would be better to go with female candidates. Utz, uh, Dr. Utz's comment was that gender was in the mix. So there is sufficient evidence here that, uh, the, uh, decisions that we're challenging here were suffused with questions about, uh, gender and goes directly to the issue of motivation. And then I believe it goes directly, uh, from there to the question of whether there's a denial of equal protection that the, uh, university was going out of its way, uh, to make sure that a female rather than male was going to fill this. What do you, so I think judge Bush's question was about, um, qualified immunity. So not only do you have to show, um, an equal protection violation, but you also have to show that it was clearly established. And I suppose I do see the argument that, um, uh, the Dean was kind of put in between a rock and a hard place. On one hand, he had allegations of conflict of interest. On the other hand, he had allegations that they would engage in sex discrimination if they didn't hire your client. Um, so what would have clearly established to him that the result of, okay, well, this is just a flawed process. Now let's just scrap it, that that, um, would violate what would, would establish a clearly established violation of the equal protection clause. Well, this argument or this issue of, um, qualified immunity, uh, you know, is introduced into the case with the notion that, well, we haven't identified a specific case comparator, uh, comparator case that goes to the same facts. And I don't know, I'm certainly unaware of any case in which I, uh, a hiring, uh, uh, body was, uh, perplexed over in the alleged conflict in the, uh, in the, uh, departments, which would impact, uh, the propriety of the, of the appointment. I'm just aware of none. But what we do know is that the issue of whether you are, uh, hiring on the basis of gender is clearly established, uh, throughout. And there's no question that everybody involved in this search knew about that issue because they discussed the prospects that they might be sued because they, they hired a, uh, a male or a woman, whichever the problem may be. But this was that odd case or that obvious case or that rare case where it's clearly established that, uh, uh, this is something which is verboten, so to speak, in, in, in higher education and public institutions. You cannot make a hiring decision based on gender. I mean, that's, it's just, uh, it's fundamental to what, uh, supervisors and hiring officials in college administrations are aware of. And so I don't think it's way out of this case. Yeah, I want to switch over to the, um, official capacity equal protection claim. And you're asking, as I understand it, for, I guess, what would be called instatement as opposed to reinstatement because there would be a creation of a new position. And I'm, I'm struggling with, um, uh, that's not exactly the same as reinstatement because for reinstatement, the state has already made the policy decision to have a position. And you're, you're just simply, we would be ordering for the condition to be filled. But here we're ordering actually the, the state to create a new position. And for ex parte young purposes, isn't that verboten? I mean, that we're, we're, we're ordering the state to, to essentially, um, spend money that they haven't already appropriated. First, John, I believe in this circumstance, uh, instatement and reinstatement may be a false, uh, uh, dichotomy because they had determined they were going to fill a position. They had, uh, authorized this position. They, uh, uh, appointed a search committee. They went through, uh, you know, hell and high water, call it what you will to, to hire somebody. And presumably they authorized the payment of money for this position. Now, I also pointed out in the briefing that the court never went into the, the, uh, the hiring process, uh, where the money was going to come from, who was paying the money for this position, how much money was going to be paid for this position. So those are all at least open questions. But I think in terms of the dichotomy between instatement and reinstatement here, I agree someone who had not already been, uh, uh, appointed, but the position had been authorized. And so that's why I believe the, the distinction between, uh, reinstatement and instatement is, is, is not a clear distinction. Finally, I wanted to ask you about, um, under Title IX, assuming that we did proceed on the assumption that there's a cause of action. The statute says that it's no person in the United States. Um, what exactly are you saying why, uh, Mr., uh, uh, Professor Charlotte Perkins was in the United States, given that he was applying for the job from Cambridge, England? Well, the fact that you may have made a phone call or submitted an application from England, uh, does not make him not a person in the United States as it relates to this position. Certainly if he had the position, and by the way, he, you know, he came in to, for the interviews. Uh, he is, by the way, and there was, I cited case law in the, uh, in the brief in which the court talked about not persons in the United States, they talked about citizens. And there's no question that Dr. John Perkins was a citizen. But in any case, to fill this position, you have to be a person in the United States. And it would be, I think, an artificial distinction and one that would be rife with trouble if you say, well, someone was not always at every moment, the person in the United States, and it could really lead to a lot of mischief, I think, with what, what facts are you saying this established that he was a person in the United States? He would be holding, if he were a researcher at the University of Cincinnati, he would be a person in the United States to fill that. Even if he did all of his work abroad, if he were employed by the University of Cincinnati, if he was doing all his work in England, he would still be a person in the United States. Well, he was a person in the United States for purposes of the application, he came to the United States where he was interviewed. And as far as I know, and this was never. So is it your position that the fact that he was interviewed in person in the United States makes him a person in the United States? Is that your number one, he's a citizen number two, he was a person in the United States when he came in to apply for the position because he was interviewed. And three, as far as I know, and but it was never explored. Because I don't, frankly, I don't think anyone ever thought of this, that he would be working in the United States and living in the United States when he filled his cell biology position, which was a faculty position. So I'm not aware of any basis that he would be continuing to live in England. He lived in England because he was filling a position in Cambridge. That's why he was there. He wasn't there because he was living there as a citizen or as a resident. With the logic with the logic of your so this statute is primarily focused on students, I think. And so lots of U.S. universities admit foreign students. With the logic of your position mean that, say, an Englander or somebody from France who applies to a university here would be would have the protections of title nine. Yes, if you are, I believe they would be entitled to those protections if they are seeking and are prepared to fill a position in the United States that's funded by federal monies. The key is that the position itself is going to be in the United States physically in the argument. Yes, your honor. Okay, Judge Murphy, do you have any more questions? And Judge Seiler, do you have any questions you want me to relay? No, that's fine. Okay, that's all we'll you have a rebuttal time and let's hear from the council for the university. Thank you. Thank you for your patience with us. Thank you. Good morning, your honors. Mike Lewis, the court, Adam Priestley on behalf of the University of Cincinnati, Dr. Ken Petrin, Dr. George Goetz. Your honors, this case is a unique one. It's a failure to hire case where no hiring decision was ever made because the job search on issue was canceled. And there are four reasons that the district court offered for why this case is appropriate for summary judgment. And three of those are threshold issues. As this court is aware, those issues are, one, whether or not 11th Amendment immunity applies to Dr. Charlton Perkins' equal protection claim against Dr. Petrin and Dr. Goetz in their official capacities. Two, whether Dr. Petrin and Dr. Goetz are entitled to qualified immunity. And three, whether Dr. Charlton Perkins can maintain a Title IX claim where he was not a United States at the time of the alleged adverse action at issue here. The alleged adverse action at issue here, your honors, is the cancellation of the search. I think this court's opinion that when this case first went up on the Rule 12b6 dismissal, it's clear that that is what the adverse action would need to be established. That was what would have to be established was that cancellation of the search was the result of Dr. Charlton Perkins' sex. But to get back to the three threshold issues, your honors, to take those kind of in reverse order to touch on the initial question that Judge Murphy had about the Supreme Court's recent grant of cert, as to the question about whether or not Title IX can even be a cause of action for employment claims. I think this court could hold this case in advance for that decision from the Supreme Court, because clearly if that decision comes down on the side that Title IX is not allowed in employment cases or is not a claim that can be brought for employment cases, then that eliminates the Title IX claim that's at issue here. But I don't think this court needs to, because I think it's clear in this case that Title IX does not apply to Dr. Charlton Perkins. Can I ask you about the response? If I understand the record correctly, he did interview in the United States. Do you think that that interview should matter or make him a person in the United States for purposes of this employment decision? No, your honor. I still think it has to be that the person is a person in the United States at the time of the alleged discriminatory act. The alleged discriminatory act necessarily here has to be when the search was canceled. That was the issue that ultimately resulted in Dr. Charlton Perkins not receiving this position. What do you do with the obvious slippery slope hypothetical that if that view is correct, an employer could simply send their employee that they want to get rid of on a nice vacation to Canada and then make a firing decision while they're overseas and avoid the statute? Ultimately, your honor, I think that's a question that the legislature would have to tackle. The Supreme Court and this court is clear that the types of potential catastrophic concerns that could be raised or the unfortunate or difficult fact patterns are things that the believe that the language that they authorized and that was signed into law is not sufficient to protect these other situations that people believe should extend the protection. But those types of situations are things that you can't run headlong into the plain language of Title IX. Title IX is very clear in terms of who it applies to. It applies only to a person in the United States. And it is clear also that Title IX is defined in terms of who is protected. It is not defined in terms of the entities which are governed by it. So again, the fact that the University of Cincinnati, Dr. Petra and Dr. Utz were in the United States at the time of the alleged adverse action, that's not what controls for Title IX purposes. The plain language of Title IX is clear. And we cited cases in our brief, albeit not Title IX cases, but Section 1981 cases, one from the Second Circuit and one from this circuit, which analyzed similar issues in terms of Section 1981 and held that given the plain language of Section 1981, that that statute did not govern those individuals. It didn't extend to protect them. And I would argue that the language of Title IX is even clearer than the language in Section 1981 that both the Second Circuit and this circuit have said is clear enough to conclude that it didn't extend to those individuals. Can I ask you a slightly different question about how the language of Title IX might be different than the language of Title VII as well, which is on causation? You seem to concede that the motivating factor test should apply here. It certainly applies under Title VII because Congress in the 91 Act added that. But the Title IX uses, is it on account of, I think, language, which historically the Supreme Court has suggested requires but-for causation. Do you think Title IX should be subject to a but-for cause test or should it just be a motivating factor test for purposes of liability? I do think it should be a but-for test, Your Honor. And I think I took my cues about the kind of framework that is normally that they would be used for Title IX based upon other case law. But to Your Honor's point, this is obviously an issue that's now made its way that the Supreme Court found it to be, you know, sufficiently questionable as to whether or not it even applied to employment cases. But the on account of language, to me, is much more akin to the language that's found in the ADE, the Age Discrimination and Employment Act, which the Supreme Court has said in Rose's decision requires but-for causation. So I do think that it is sufficiently and clearly different than the language in Title VII such that the motivating factor test is not what should be applied for Title IX cause of action. It should be the but-for causation test. How do you think that should, so we have case law, at least in Title VII, that suggests the direct evidence test for pretext, if you have direct evidence, the burden of persuasion shifts to the employer to disprove a but-for cause or show the absence of it. I just don't know how our direct evidence test would apply in the context where it's not Title VII and it's not a motivating factor test. Yeah, well, I think in that, in the scenario when we're governed by a but-for causation test, if we're talking about how direct evidence, is that, your Honor's question, how direct evidence? Yeah, what the, because we have, we have the McDonald-Douglas for circumstantial evidence, and then we have the direct evidence test for what are some arguably direct evidence of discrimination in this record, and I'm just curious what the kind of framework should be for if we're not, if we don't have the motivating factor language. Yeah, and I believe even under the ADEA case law, which again, is kind of one of the more kind of, I guess, typical employment law related claims that is governed by the but-for causation test. In those scenarios, I think courts have still used the kind of more common McDonald-Douglas burden shifting framework, even in the case of direct evidence, meaning that there's direct evidence, even that if the employer offers legitimate non-discriminatory reasons for its decision, then the burden shifts back to the plaintiff or the employee in that situation, or former employee in that situation, to then make out a case that, you know, both the reason was, there's evidence that both that the reason was untrue or false or not sufficient to warrant the adverse action, and that the, there's sufficient evidence to get to a jury that it was also motivated by whatever the characteristic is. Speaking of that, what do you, what do you, I thought the best evidence on the other side is, I might butcher her name, but is Bushback, Bushback's notes, where she suggested that the dean, Petrin, said that they decided to focus on women. Why wouldn't that be seen as direct evidence of discrimination? And that's where I got, I think, Your Honor, that we have to look at the, you know, the specific lens that this case needs to be examined through, which is, what is the adverse action that's at issue? What has to be proven by the plaintiff, by Dr. Charlton-Pertman to be able to succeed is to be able to show that the cancellation of the job search was based upon Dr. Charlton-Pertman's success. And the statement which, that Dr. Bushback claims Dr. Petrin said in that meeting was not in connection with the decision to cancel the search. She allegedly, you know, and obviously we're at summary judgment purposes, so it has to be construed in the favor of the plaintiff. Dr. Petrin, obviously, well, I shouldn't say obviously, but he, I think, testified that that wasn't what he said in that meeting. But again, putting that aside, that statement, even based upon Dr. Bushback's notes and her representations about what was said in that meeting, was not in connection with the decision to cancel the search. And this court not only has said that statements by decision makers not connected to the decision that's at issue can't be direct evidence, this court's also said in EEOC versus Ford Motor Company, Bush versus Dictaphone, that statements by decision makers outside of the decisional process at issue alone can't be proven of a pretext. So, and that's where, you know, we've never argued prima facie case. You know, our focus has always been that they can't show pretext. They have no evidence to be able to establish that the three independent reasons that Dr. Petrin has always consistently maintained were his reasons for canceling the search. Those three reasons, the plaintiff has never been able to establish sufficient evidence for any of those three reasons, much less all three of those reasons, that those were false. They didn't motivate his decision to cancel the search, which again, I think has to be the proper lens through which this case is analyzed. And that kind of, I think, gets to the issue of qualified immunity. Before you get into that, what were the three reasons? I know conflict of interest is one, right? Correct. And the conflict of interest issue that was ultimately brought to Dr. Petrin's attention was kind of the thing that set this whole process awry to begin with. And then Dr. Petrin then asked Dr. Ellis, okay, please go out and canvas the other professors, the other faculty members in the group. And what he ultimately learned then, what he came to see beyond that conflict of interest issue that Dr. Petrin has always maintained that he felt Dr. Bushback should have stepped aside is at least as it relates to consideration of Dr. Charlton Perkins. So that was one. And then two was in the time between when the kind of three to one vote came to Dr. Petrin's attention, he also received email correspondence of Dr. Bushback, you know, not only the fact that she was involved in consideration of Dr. Charlton Perkins, that he believed she was showing her obvious partiality toward him. There was other professors who gave their thoughts to Dr. Bushback via email about why they didn't think Dr. Charlton Perkins had a very good presentation. And she responded at a number of occasions and kind of forcefully tried to rebut those. And those things were sent to Dr. Petrin. He testified in his deposition that he believed that that was kind of a big factor that, you know, what he said was kind of evidence of her partiality. And then the third was that there was a rift in the department that resulted from the decision to kind of not adopt, initially not adopt the three to one vote of the search committee. And, you know, it was undisputed at summary judgment that there was a rift in the department as a result of the job search that came about. So I think that's an established fact that that occurred. So those are the three reasons. And two of those reasons, the evidence of partiality and the rift in the department, Dr. Charlton Perkins has effectively offered no reason or argument as to why those should be disbelieved or why those weren't sufficient to warrant cancellation of the job search. So we think that, you know, very least based upon those two reasons, but even the third reason, we think there's very good, we think the district court got it right, that even that reason, the perceived conflict of interest, that at no point in time, there's no record evidence that that wasn't a serious issue to Dr. Petrin. He's maintained consistently throughout and his deposition in real time and during discussions that that was a big issue for him and that he believed Dr. Bushbeck should have stepped aside. Are you carrying all that over? Is that the reason why there's not a quality, why there is qualified immunity? It's not clearly obvious because of those three points, or is there something else? Well, we certainly think that that's one point, but we think that it's not clearly established. I think to the questions that were asked by both yourself, Judge Bush, and Judge Murphy, and I think opposing counsel kind of conceded that there is no case that is similar to this one where it would be clear and obvious to Dr. Petrin that canceling the job search when he did was a constitutional violation. And the argument that's been raised by opposing counsel and by Dr. Charles Perkins in— Let me ask you, do you have a case going the other way where there was a decision by a university not to hire anyone and the court blessed it and said that's fine? Do you have a case saying something like that? Well, I mean, not in the university context. I mean, I think in our previous briefing, that's ultimately one of the reasons why I think it made its way up to this court a few years ago on 12b-6 was that there's a number of cases out there which had held that when there was cancellation of job searches that were at issue, that a person couldn't make out a— I think in a lot of those cases, they were Title VII cases, they were private employers, but couldn't make out Title VII cases because there was no adverse action that was at issue. So I do think there's a number of cases out there that go the other way. Again, is it unique enough to this case in the higher ed context? And hence, even the more unique factors like this case has where the position at issue not only wasn't hired for, but it is never sought to be hired for again. And I see that my time has run. You can keep going. You can keep going. And I just wanted to kind of quickly use that to kind of dovetail and talk a little bit just for a minute about the 11th Amendment immunity issue that Your Honor discussed with opposing counsel. You know, this is an in-statement case, which I don't think there's even any cases that clearly say out there that in the in-statement context that the ex parte young exception can be applied. But this is an even more unique case because it's not a position that even exists. It never existed. Sure, the university had a search process where it was potentially going to hire somebody for that position. But the testimony is clear and the record evidence is clear that that position has never existed. If a district court or this court were to say that Dr. Charlton Perkins need to be instigated to that position, that would mean monies from the state of Ohio that are not being used would have to be used to fund a position that has never existed. So for those reasons, we think that the ex parte young exception doesn't apply and the cause of action. OK, Judge Murphy, do you have any more questions? Judge Seiler, do you have any you want to ask through me or I don't know, I think maybe this counsel could hear your question, but nothing else. OK, well, thank you, counsel. We'll hear the rebuttal now. A few points. First, I want to go back to Judge Murphy's comments regarding students and Title IX. I mean, I think I think the judge hit it on the head there. There's a lot of mischief to be had if you're asking students from abroad to apply for positions in the United States and then say, well, you're not a person in the United States and therefore we're taking we're pulling the rug out from under you. There is no position. I can't. My experience has been in dealing with universities that universities make an awful lot of money and depend very heavily, at least half on tuitions from foreign students. So to say, well, you were not in the United States does does not make any sense. But there is also the authority that the court has laid on this Title IX in that it relates to citizens. So that, I think, is a bogus argument. I also want to state perhaps this issue of but for and motivating factor, maybe a little premature. That could be something that who knows where the Title IX case will be. But certainly we may have more instruction as to what proper instructions may be, what what burdens of proof may be after this case is tried. And it's determined that there was discrimination here and the motivation decision has been decided. Same with qualified immunity. Same with all of these cases, unless there's a finding that there was bias that infected this these decisions, it really doesn't matter. I also want to point out the cancellation of the search, which we spent some a lot of time talking about for various reasons. And the four reasons, well, they may be interesting. But the fact is that before the search was canceled, a violation occurred in itself. When someone was rejected, the search committee had made a recommendation to hire. It was turned down. We believe it was treated irregularly. And Mark Charlton Perkins was treated irregularly. The recommendation was treated irregularly by being turned down. So there was a completed act of discrimination before we even get to the cancellation. And we have a lot of facts in in our reply brief, which was as to why this is just pretext. There were no problems with a conflict until it was determined that the recommendation was to hire hire the mail. Then suddenly there was a conflict. Council makes a great deal about how there was conflict and everybody was opposed to it. Well, no. Yeah, there were differences of opinion. But again, also, Dr. Bushback offered to step aside. There were other approaches they could have taken to the case short of canceling the search. Those were all rejected. And then but overall, and this is the transcendent fact and transcendent statement. And it's in our brief. And it comes from the deposition of Dr. Utz, who said at his deposition, whether or not gender balance influenced the decision of who was the appropriate candidate to be hired. I say in the brief, Utz was crystal clear quotes, it meaning gender was in the mix. That answers all the questions, whether or not there was a conflict of interest, whether and some conflict over that, or some unhappiness over that. The record is clear, direct evidence is clear. It was in the mix, a jury has to determine to what extent the gender factor influenced all of this. And there's no escape from that. So I think, I think that's the big issue here. And I think just by virtue of it being direct evidence, and I think that is direct evidence. This is a statement right from a decision maker, gender was in the mix. Okay, let a jury parse it out. To what extent was it in the mix? That's my argument, your honor. Okay, well, thank you so much. Thanks to both counsel for bearing with us on all the technical difficulties today. And we will take the case under submission.